PACHER et al., Appellants and Cross–Appellees,

v.

INVISIBLE FENCE OF DAYTON et al., Appellees and Cross–Appellants.

[Cite as *Pacher v. Invisible Fence of Dayton,* 154 Ohio App.3d 744, 2003-Ohio-5333.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19614.

Decided Oct. 3, 2003.

746

Paul R. Leonard, for appellants.

Scott G. Oxley, for appellees.

BROGAN, Judge.

{¶ 1} In this case, Andrew Pacher Jr. and Alyce Pacher appeal from the dismissal of claims for negligent infliction of emotional distress brought on behalf of Mr. and Mrs. Pacher, their minor children, Sarah and Andrew III, and the family's golden retriever, "Boomer." These claims are based on an injury Boomer allegedly sustained while confined within an "invisible fence" installed by cross-appellant, Invisible Fence of Dayton ("IFD"). After a bench trial, the court awarded a judgment of $1,714.85 against IFD for negligence and breach of contract.

{¶ 2} The Pachers raise the single assignment of error:

{¶ 3} "The trial court erred and abused its discretion by granting the defendants-appellees' motion to dismiss Counts Two, Three, and Four of plaintiffs' complaint regarding the emotional distress (non-economic damages) suffered by 'Boomer's pet guardians, and 'Boomer' himself as a result of defendants' negligence and breach of contract."

{¶ 4} In contrast, IFD presents as a single assignment of error:

{¶ 5} "The trial court erred in refusing to grant defendants-appellees' motion for a directed verdict at the close of plaintiffs' evidence regarding the claims of negligence [sic], the trial court's decision and judgment is contrary to law and against the manifest weight of the evidence."

{¶ 6} Because both the assignment of error and cross-assignment of error are without merit, the trial court judgment will be affirmed.

I

{¶ 7} Recently, in *Oberschlake v. Veterinary Assoc. Animal Hosp.*, 151 Ohio App.3d 741, 2003-Ohio-917, 785 N.E.2d 811, we held that dog owners cannot recover noneconomic damages for injury to their "companion animals." Our decision was based on the fact that Ohio law classifies dogs as "personal property" and restricts damages to the difference between the property's fair market value before and after loss. Id. at ¶ 15 and 19.

{¶ 8} The notice of appeal in the present case was filed before we issued the decision in *Oberschlake*. While the Pachers acknowledge that *Oberschlake* controls the outcome, they would like us to initiate a change in the law. We see no reason to depart from our prior decision and will continue to follow the current law, which rejects claims for noneconomic loss caused by injury to companion animals.

{¶ 9} The animal in this case, "Boomer," is a golden retriever belonging to Andrew and Alyce Pacher. When the Pachers acquired Boomer in December 1997, they began to investigate invisible fences as a method of restraint. Ultimately, they purchased a "Top Dog" package from IFD in July 1998. This package included installation of a fence (up to one acre), a platinum computer collar, a one-year computer-generated battery plan, and five visits for personal training assistance, for a total price of $1,527.80.

{¶ 10} The IFD invisible fence uses buried antenna wire, a transmitter (located in this case in the garage), and a dog collar. If the dog attempts to break the plane of the fence, an electric "correction" or shock is delivered. The transmitter's job is to emit a radio signal through the antenna wire buried in the yard, and the collar delivers the actual "correction." The collar is a snap collar with ends that clip together. It also has metal prongs that make contact with a dog's neck. Knobs on the transmitter adjust how close a pet can come to the wire before the collar activates. However, the amount of correction can be increased only by adjusting dials in the collar. This is not something customers can access; instead, IFD personnel carry miniature computers for that purpose.

{¶ 11} After the fence was installed, IFD general manager, Dave Novaks, trained Boomer and the Pachers on using the system. When the dog nears the fence, i.e., enters the signal field, the collar emits a beeping sound. By being exposed to corrections during the training period, the dog learns to retreat when it hears the beeping sound. Both Boomer and the Pachers passed the training

sessions, which ended in August 1998. At that point, Novaks saw no sign that Boomer would escape the containment system.

{¶ 12} Unfortunately, Boomer was never successfully contained by the invisible fence. Over the next two and a half years, IFD made many service calls to the Pacher home to deal with containment issues. IFD claimed that many calls were the Pachers' fault because they accidentally cut the wire, did not properly secure the collar, or improperly installed the collar's battery. Novaks did say that the fence has a failure rate and that he had experienced one other failure of an invisible fence to contain a dog. In addition, Novaks admitted that the Pachers communicated dissatisfaction with the product by making consistent complaints between July 1998 and January 2001.

{¶ 13} Likewise, Mr. Pacher testified about continuous containment problems that began around three months after the fence was installed. From that point on, Boomer was never successfully contained for more than two months at a time. Boomer originally wore a collar with two prongs and a three-volt battery. Later, he was switched to a larger collar that had four prongs and a nine-volt battery. However, the containment problems continued.

{¶ 14} In late November or early December 2000, Mrs. Pacher called Novaks after yet another incident when the fence failed to contain Boomer. This time, Novaks suggested a new idea, called the "sandbag technique." Basically, this involved attaching a gym bag filled with 50 pounds of sand to the dog. The bag would slow the dog down, causing him to receive a greater "correction" when passing through the signal field. The Pachers rejected this idea because they felt that it was ludicrous and was potentially cruel to the dog.

{¶ 15} After the Pachers called IFD in November or December 2000, Boomer did not wear a collar. Instead, he was contained with a lead that allowed him to run around the yard in a small radius. Subsequently, on January 25, 2001, Mr. Pacher and Novaks had a heated discussion about the containment problem. Later that day, Novaks came to the house and looked at the collars that had been used. Mr. Pacher was not at home at the time, so Novaks talked to Mrs. Pacher.

{¶ 16} Novaks testified that when he inspected the collars, one was too loose and the battery on the other was installed incorrectly. Novaks corrected the problems, put both collars on the dog, and took Boomer outside, where he entered the signal field and reacted by staying in the yard. Up to this point, Boomer had never worn two collars at once. Because Mrs. Pacher disagreed about the listed reasons for Boomer's containment problems and did not feel that the problems were the Pachers' fault, she refused to sign the service ticket.

{¶ 17} After Novaks left, Mrs. Pacher did not touch the collars, nor did she adjust them in any way. Boomer then went outside and came back in. Later

that day, when the children came home from school, Mrs. Pacher put Boomer outside again. Shortly thereafter, she heard a loud piercing bark like she had never heard from a dog before. When Mrs. Pacher went to the front door, Boomer almost knocked her over coming in the door. He then collapsed on the floor. Mrs. Pacher smelled a foul odor coming from the dog and called Novaks to tell him what had happened. Novaks reassured her that the collar could not hurt Boomer. He also said that it was a good sign that Boomer had come to the front door instead of running away.

{¶ 18} Between then and February 5, 2001, Boomer was very quiet and would not leave the deck of the house. Boomer definitely acted differently from normal. On February 5, Mr. Pacher noticed while petting Boomer that his hand had become wet. After removing Boomer's collar, he discovered dark black wounds, a lot of irritation, and pus. The next morning, Mrs. Pacher took Boomer to the veterinarian, who prescribed a two-week antibiotic. After that date, the Pachers never again used the invisible fence or collars.

{¶ 19} Counts Two and Three of the complaint allege that IFD negligently caused the Pachers and their minor children to suffer emotional distress at the sight of Boomer's suffering from burns and open sores, and from the attendant odor. Count Four of the complaint contains Boomer's direct claim for his own pain, injury, and emotional shock. The trial court dismissed these claims before trial, finding, first, that the Pachers failed to state a claim for negligent infliction of serious emotional distress because they were not bystanders to the injury. We agree, as this is one reason we rejected the claim for negligent infliction of emotional distress in *Oberschlake*. Id., 151 Ohio App.3d 741, 2003-Ohio-917, 785 N.E.2d 811, at ¶ 16.

{¶ 20} The trial court in the present case also noted that Ohio does not recognize a cause of action for serious emotional distress caused by injury to property. Again, this is consistent with our prior decision. Id. at ¶ 7–10. Finally, the trial court said that the claims in the complaint failed to meet the "serious emotional distress hurdle" required for recovery. Instead, the complaint described a "temporary emotional reaction." This is similar to our observation in *Oberschlake* that "shock" over improper surgery on a dog is not the type of debilitating emotional injury required for negligent infliction of emotional distress. Id. at ¶ 17.

{¶ 21} The trial court next addressed Boomer's direct claim for emotional distress. In this regard, the court noted that despite Boomer's fine qualities as a dog, his status as "personalty" deprived him of the legal capacity to sue. Again, this is consistent with *Oberschlake*, in which we held that dogs cannot directly

recover for their injuries. In particular, we stressed evidentiary problems that would arise if animals are allowed to sue directly. Id. at ¶ 18.

{¶ 22} Without in any way discounting the bonds between humans and animals, we must continue to reject recovery for noneconomic damages for loss or injury to animals. This is the position that the vast majority of jurisdictions take. See, e.g., *Koester v. VCA Animal Hosp.* (2000), 244 Mich.App. 173, 176, 624 N.W.2d 209; *Rabideau v. Racine* (2001), 243 Wis.2d 486, 627 N.W.2d 795; and *Harabes v. Barkery, Inc.* (2001), 348 N.J.Super. 366, 371, 791 A.2d 1142. As we noted in *Oberschlake*, this is also the view our legislature and courts have taken, by choosing to classify dogs as personal property. 151 Ohio App.3d 741, 2003-Ohio-917, 785 N.E.2d 811, at ¶ 14–15.

{¶ 23} Rejection of recovery for such claims is warranted by various factors, like the difficulty in defining classes of persons entitled to recover, and classes of animals for which recovery should be allowed. In addition, courts have expressed concern about quantifying the emotional value of a pet and about increasing potential burdens on the court system. *Harabes*, 348 N.J.Super. at 371–372, 791 A.2d 1142. These are public-policy considerations that we stressed in *Oberschlake*. 151 Ohio App.3d 741, 2003-Ohio-917, 785 N.E.2d 811, at ¶ 21. We see no reason to change our point of view.

{¶ 24} The Pachers acknowledge that *Oberschlake* is controlling but believe that the present case involves different principles. They contend that IFD's action in placing two collars on Boomer and dramatically "turning up the juice" was reprehensible, as opposed to merely negligent. They believe that we should consider what is in the best interests of the companion animal to make a "just and wise" decision. According to the Pachers, an award of noneconomic damages is in the best interest of all companion animals because it would deter future misconduct.

{¶ 25} We disagree that misconduct is involved in this case. While the complaint does request punitive damages, the allegations refer only to negligence and breach of contract, not misconduct. Furthermore, the evidence fails to suggest misconduct or anything bordering on intentional injury. Novaks testified that he liked Boomer and did not do anything he thought would injure the dog. There is no evidence that this was not the case. The fact that IFD may have negligently injured the dog does not mean that it intentionally did so, or that a "deterrent" measure is required.

{¶ 26} Accordingly, appellants' assignment of error is without merit and is overruled.

## II

{¶ 27} In the cross-assignment of error, IFD presents two different claims. The first is that the trial court erred in refusing to grant a "directed verdict" at the close of the Pachers' case. As support for this claim, IFD alleges that the Pachers failed to present any evidence proving the essential elements of negligence. IFD also focuses on the trial court's alleged misapplication of res ipsa loquitur.

{¶ 28} Before addressing the merits of IFD's argument, we should note that motions for directed verdict are not appropriate in bench trials. *Tewarson v. Simon* (2001), 141 Ohio App.3d 103, 114, 750 N.E.2d 176. If such motions are made in non-jury trials (as in the present case), they are construed to be motions for involuntary dismissal under Civ.R. 41(B)(2). *Miami Valley Hosp. v. Payson* (Dec. 7, 2001), Montgomery App. No. 18736, 2001 WL 1562103, * 12. This distinction is significant because of the different roles the trial court assumes in ruling on motions to dismiss as opposed to motions for directed verdict. *Bank One, Dayton, N.A. v. Doughman* (1988), 59 Ohio App.3d 60, 62, 571 N.E.2d 442, fn. 4.

{¶ 29} Under Civ.R. 41(B)(2), a defendant may move for dismissal on the ground that under the facts and law, the plaintiff has shown no grounds for relief. In this situation, the trial court's role is "to weigh the evidence, resolve any conflicts therein, and render judgment for the defendant if the plaintiff has shown no right to relief." Id. at 63, 571 N.E.2d 442. The trial court's only consideration in ruling on a motion for involuntary dismissal is " 'whether the plaintiff has made out his case by a preponderance of the evidence.' " *L.W. Shoemaker, M.D., Inc. v. Connor* (1992), 81 Ohio App.3d 748, 752, 612 N.E.2d 369, quoting *Jacobs v. Auglaize Cty. Bd. of Commrs.* (1971), 27 Ohio App.2d 63, 65, 56 O.O.2d 245, 272 N.E.2d 635.

{¶ 30} In contrast, motions for directed verdict under Civ.R. 50(A) do not present factual issues, and the trial court does not weigh the credibility of witnesses. Instead, the court simply reviews the legal sufficiency of the evidence. *Campbell v. Colley* (1996), 113 Ohio App.3d 14, 18, 680 N.E.2d 201.

{¶ 31} These differences are also important because they impact our review power. *Bank One, Dayton, N.A.,* 59 Ohio App.3d at 62, 571 N.E.2d 442, fn. 4. Specifically, motions for directed verdict present questions of law, and we review the trial court judgment de novo. *Campbell,* 113 Ohio App.3d at 18, 680 N.E.2d 201. On the other hand, we can set aside the dismissal of a case under Civ.R. 41(B)(2) "only if erroneous as a matter of law or against the manifest weight of the evidence." 59 Ohio App.3d at 63, 571 N.E.2d 442.

{¶ 32} Consequently, IFD should have moved to dismiss the case under Civ.R. 41(B)(2), and the trial court should have considered the motion by applying the standards in that rule. However, no prejudice occurred as the result of this error.

{¶ 33} Notably, the standard we just quoted for Civ.R. 41(B)(2) applies to situations where the trial court grants a motion to dismiss, not where (as here) the court denies the motion to dismiss. In this regard, Civ.R. 41(B)(2) explicitly states that after a defendant moves to dismiss a case, the court, "as trier of the facts may then determine them [the facts] and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."

{¶ 34} Thus, when a motion to dismiss is made, the trial court can choose either to dismiss the action or to proceed with further evidence. In the present case, the trial court selected the second option of hearing additional evidence. Because this was a choice expressly allowed by Civ.R. 41(B)(2), we cannot find error in the trial court's decision. Accordingly, we reject IFD's claim that the trial court erred by refusing to dismiss the case.

{¶ 35} What we think IFD is actually challenging is the legal sufficiency of the evidence supporting the trial court's judgment against IFD for $187.05. This part of the judgment is based on a finding of negligence and represents what the Pachers paid to treat Boomer's injuries.

{¶ 36} "To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom. * * * The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265.

{¶ 37} IFD contends that the trial court erred in finding that IFD owed a duty to the Pachers. However, we believe that a duty existed, based on the parties' relationship and the purpose of the visit. Specifically, Novaks's visits to the Pacher home were neither gratuitous nor voluntary. Instead, they were service calls to a customer. The IFD exhibits indicate that when visits are made to a customer, a "service request" form is completed and the customer is charged a fee for the visit.

{¶ 38} For some reason, IFD did not present service-request forms at trial for all calls to the Pachers' home. Instead, only two forms were submitted. One covered a call on February 8, 2000, and the other was for the call on January 25, 2001, i.e., the date of the alleged injury. On the former date, IFD was called because Boomer escaped confinement. The form for this date indicates that

Novaks came to the house, moved the collar from Boomer's neck to his waist, and conducted retraining. The Pachers paid $55 for the service call the same day.

{¶ 39} A similar service-request form was completed for the January 25, 2001 visit. Although IFD did not apparently charge the Pachers for this call, it was neither voluntary nor gratuitous. Novaks testified that he came to the house that day because of a request for service, and he did fill out a form. As we mentioned, Novaks and Mr. Pacher had a heated discussion before the service call, and Mrs. Pacher refused to sign the form. Consequently, the inference can be drawn that any failure to charge for the January 25, 2001 service call was due to customer dissatisfaction and was not a gratuitous act.

{¶ 40} Accordingly, IFD had a duty, as would any party offering services, to conduct business without causing injury to its customers or their property. See *Mussivand,* 45 Ohio St.3d at 318–319, 544 N.E.2d 265 ("The common-law duty of due care is that degree of care which an ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances. * * *A person is to exercise that care necessary to avoid injury to others.").

{¶ 41} Whether a duty is breached and whether the breach proximately caused an injury are normally questions of fact, to be decided by the jury, or by the court in a bench trial. *Miller v. Paulson* (1994), 97 Ohio App.3d 217, 221, 646 N.E.2d 521; and *Mussivand,* 45 Ohio St.3d at 318, 544 N.E.2d 265. In the present case, the trial court applied the doctrine of res ipsa loquitur in finding that IFD caused injury to Boomer. IFD contends that this was incorrect, because the requirements for res ipsa loquitur were not met. In particular, IFD relies on the lapse of time between the events that allegedly caused the injury and its discovery and on the fact that IFD did not have exclusive control of the instrumentality causing the injury.

{¶ 42} "[R]es ipsa loquitur is an evidentiary, as opposed to substantive, rule of law, which allows the jury to infer negligence in cases where the prerequisites for its application are met." *Gayheart v. Dayton Power & Light Co.* (1994), 98 Ohio App.3d 220, 230, 648 N.E.2d 72. Its application "does not change the plaintiff's claim, but merely allows the plaintiff to prove his case through circumstantial evidence." Id.

{¶ 43} According to the Ohio Supreme Court, " 'To warrant application of the rule a plaintiff must adduce evidence in support of two conclusions: (1) That the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.' " *Jennings Buick, Inc. v. Cincinnati* (1980),

63 Ohio St.2d 167, 170, 17 O.O.3d 102, 406 N.E.2d 1385, quoting *Hake v. Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66–67, 52 O.O.2d 366, 262 N.E.2d 703.

{¶ 44} In *Jennings Buick,* the court explained:

{¶ 45} "The second prerequisite * * *, that there must be evidence tending to prove that the injury ordinarily would not have occurred if ordinary care had been exercised, serves to establish the logical basis for the inference that the plaintiff's injury was the proximate result of someone's negligence. The first prerequisite, that there must be evidence tending to prove that the instrumentality causing the injury was under the exclusive management and control of the defendant, permits the further inference that it was the defendant who was negligent." 63 Ohio St.2d at 170–171, 17 O.O.3d 102, 406 N.E.2d 1385.

{¶ 46} Applying these standards to the present case, we find that the injuries to Boomer would not have occurred if ordinary care had been exercised. Moreover, we also find that the evidence tended to prove that IFD had exclusive management and control of the instrumentality causing the injury. Specifically, the injury occurred a short time after Novaks placed two collars on Boomer and significantly increased the shock that was applied. Mrs. Pacher testified that she did not touch or adjust the collars after Novaks placed them on the dog. Clearly, something significant happened when the dog whined in a loud, piercing voice, bolted through the front door, and collapsed in the front entrance of the house.

{¶ 47} We also are not troubled by the time lapse between the injury and its discovery. There is no evidence that anyone adjusted the collar in the meantime, and the record does not reveal any evidence of a further injury to Boomer. Novaks's suggestion was that Boomer's injury was caused by a collar that was too tight and by failure to remove the collar at night. However, the dog had worn a collar for the previous two years and had not developed any injury. The Pachers also testified that they removed the collars every night, and the trial court was entitled to believe their account. Finally, pictures show blackened areas on the dog's skin, where the prongs were located, consistent with a burn.

{¶ 48} " '[A] plaintiff seeking to invoke the doctrine of *res ipsa loquitur* in a negligence action need not eliminate all reasonable non-negligent causes of his injury. It is sufficient if there is evidence from which reasonable men can believe that it is more probable than not that the injury was the proximate result of a negligent act or omission.' " *Gayheart,* 98 Ohio App.3d 220, 232, 648 N.E.2d 72, quoting *Jennings Buick,* 63 Ohio St.2d at 172, 17 O.O.3d 102, 406 N.E.2d 1385. Accordingly, we find no error in the trial court's application of res ipsa loquitur, and the portion of the judgment against IFD on negligence grounds is affirmed.

{¶ 49} The rest of the judgment is based on a $1,527.80 award against IFD under Counts Five and Six, which alleged breach of contract, breach of express and implied warranties, promissory estoppel, and detrimental reliance. IFD contends that this award was against the manifest weight of the evidence and was contrary to law.

{¶ 50} In this context, IFD's first contention is that the trial court's decision misstated the contract. According to IFD, the contract contained only a "money-back guarantee," good for 60 days, and a "one-year, money-back" performance guarantee. Since the Pachers never asked for a refund within the time limits specified by these guarantees, IFD claims that it cannot be held liable for breach of contract. IFD further argues that the trial court improperly confused these limited warranties with express and implied warranties.

{¶ 51} The money-back guarantee in the contract provided:

{¶ 52} "If within (60) sixty days from the date of delivery of the Invisible Fence System, Customer is not completely satisfied with the System, and within sixty (60) days of delivery of the System, Customer requests a refund in writing and returns all components of the System to the Company at Customer's expense, Company will refund to the Customer the full purchase price."

{¶ 53} Similarly, the "one-year, money-back guarantee" stated:

{¶ 54} "If a customer's animal is not satisfactorily contained by COMPANY within one year from the date of installation by COMPANY, COMPANY will offer to remove the system and refund the full purchase price of the equipment. 'Not satisfactorily contained' means that the Customer's animal continues to break through the signal field and escape the Invisible Fencing System after the Customer has fully complied with all terms of this Agreement and the Company has exhausted all containment options."

{¶ 55} In its decision, the trial court found that complaints about containment began before the end of the first year of the contract and that the parties acted in good faith thereafter to remedy the situation. However, they were never successful. The court refused to apply the one-year time limitation because the parties did not intend for this provision to be enforced against the Pachers if the containment problems were not resolved.

{¶ 56} After reviewing the record, we agree with the trial court. " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *Shampton v. Springboro,* 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883, at ¶ 33, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75

Ohio St.3d 433, 439, 662 N.E.2d 1074. As the Ohio Supreme Court has noted, to succeed on a promissory estoppel claim:

{¶ 57} " 'The party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading.' " Id. at ¶ 34, quoting *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630.

{¶ 58} Based on the evidence at trial, we agree with the trial court that the Pachers reasonably relied on IFD's conduct, which indicated that IFD would rectify the containment problems. More important, the Pachers did not have an obligation to take action within the first year of the contract, beyond notifying IFD of containment problems (which they did). Instead, IFD had a contractual obligation to offer to refund the customer's money and remove the equipment if the animal was not satisfactorily contained within a year. IFD failed to comply with this provision in the contract, and instead continued well beyond the initial year with efforts to contain the dog. In fact, IFD never offered to refund the Pachers' money and remove the equipment.

{¶ 59} Admittedly, IFD claimed at trial that the dog was satisfactorily contained and that the Pachers caused the containment problems. This was disputed, and the trial court chose to believe the Pachers. This is a credibility decision that the trial court was in the best position to make. *Brookville Floor Coverings Unlimited v. Fleming*, 151 Ohio App.3d 456, 2003-Ohio-311, 784 N.E.2d 721, at ¶ 18.

{¶ 60} As an additional reason to reverse the trial court judgment, IFD argues that the Pachers' case was not based on a claim that the fence failed to satisfactorily contain Boomer but was instead based on allegations that the collar emitted an electrical signal that burned the dog. This is incorrect, as Count Five of the complaint contains claims for breach of contract, as well as breach of express and implied warranties. In addition, Count Five alleges that the invisible fence failed to achieve containment of the dog as warranted. And finally, the complaint asks for return of money that the Pachers invested in the invisible fence.

{¶ 61} The case was tried on both the negligence and contractual claims. Consistent with these theories of liability, the trial court included separate awards for negligence and for breach of contact, with the latter award being the amount originally paid for the fence. Accordingly, we find no merit in IFD's claim that the case involved only the issue of whether the collar emitted signals that injured the dog.

{¶ 62} The rest of IFD's argument focuses on facts allegedly showing that Boomer was adequately contained by the system. As we said, there were factual disputes. Again, the trial court believed the Pachers' account, and we give great deference to these types of credibility decisions. See, e.g., *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418–419, 674 N.E.2d 1159. The facts of this case do not present the exceptional situation where the evidence weighs heavily against the trial court judgment and warrants reversal as against the manifest weight of the evidence. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. To the contrary, the record supports the trial court's decision.

{¶ 63} As a final point, we note that IFD challenges the testimony of an electronics teacher who testified about the voltage emitted by the animal collars. IFD claims that this expert's conclusions did nothing to prove negligence, breach of contract, or proximate cause. Whether this is true is irrelevant, however, because the trial court did not rely on this testimony for its decision. In fact, the court's decision does not rely on any expert testimony.

{¶ 64} To the extent that the court mentioned expert testimony, it did so only in the context of the veterinarian expense. In this regard, the court noted that no expert testimony linked the expense of the injury to the dog from the invisible fence, the need for a trip to the clinic, and the treatment received. The court went on to find, however, that these matters were "so apparent as to be within the comprehension of laymen." This is an accepted means of proof "when the causal relationship is a matter of common knowledge." *Driscoll v. Gruss* (Jan. 28, 1999), Cuyahoga App. No. 73815, 1999 WL 43320, at * 2.

{¶ 65} Having reviewed the record and applicable law, we find no error in the award against IFD on grounds of negligence and breach of contract. Accordingly, the cross-assignment of error is without merit and is overruled.

{¶ 66} Because appellants' assignment of error and appellee's cross-assignment of error have both been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

FAIN, P.J., and GRADY, J., concur.