OPINION
{¶ 1} Defendants-appellants/cross-appellees, Phillip S. Hubbell, et al., appeal a judgment of the Warren County Court of Common Pleas, awarding $301,700 in damages to plaintiffs-appellees/cross-appellants, Fairbanks Mobile Wash, Inc. and Hubbell's Cleaning Systems, Inc., on their claims for fraud and conversion. Fairbanks and HCS cross-appeal, arguing the trial court erred in finding against them on their claims for breach of fiduciary duty, loss in value, punitive damages, and attorney fees. We affirm. *Page 2 
 {¶ 2} In 1977, Mike and Wanda Hubbell opened Fairbanks Mobile Wash, Inc. to provide industrial cleaning services for AK Steel. Mike ran Fairbanks' daily operations, and Wanda took care of the company's books. In 1991, Mike and Wanda's son, Phillip Hubbell, began working for Fairbanks and learned how to run the business. In 1996, Mike and Wanda started Hubbell's Cleaning Systems, Inc. to provide labor, lawn maintenance, and snow removal services for AK Steel. By the end of 1996, Phillip was the vice-president of Fairbanks and HCS, and was in charge of both companies' daily operations.
 {¶ 3} In 1998, Phillip and Dan Johnston formed JMI, Inc. to provide asbestos removal services for AK Steel. In 1999, Phillip formed Superior Mills Services, LLC, to provide laborers for AK Steel.
 {¶ 4} Fairbanks, HCS, JMI, and Superior performed their various services exclusively for AK Steel pursuant to a series of work assignments. There were no formal, written contracts between the four companies and AK Steel. Instead, AK Steel would periodically assign a job to one of the companies through a work order describing the particular project AK Steel wanted performed and the amount they would pay to have it completed. AK Steel was free under this arrangement to assign the various work projects to other companies whenever it chose.
 {¶ 5} Throughout their existence Fairbanks, HCS, JMI, and Superior "swapped labor" between themselves. Under this practice, an employee of one company would perform labor for one of the other companies when it did not have enough employees to complete a work assignment. Swapping labor provided the companies with extra personnel so they would not have to hire additional workers, and it allowed the companies to keep all of their employees busy.
 {¶ 6} In late 1999 or early 2000, Wanda discovered there was a significant *Page 3 
imbalance of swapped labor hours that worked to Superior's benefit and Fairbanks' detriment. As a result, she instructed Phillip to make sure that each employee was paid by the company for which the employee did the work in question. However, Phillip disregarded Wanda's instruction and continued his past practices regarding the labor swap. In July 2001, Mike looked over the companies' records and concluded that Phillip and Superior had misappropriated work from Fairbanks and HCS. In October 2001, Phillip resigned as vice-president of Fairbanks and HCS.
 {¶ 7} On September 24, 2004, Mike and Wanda, acting through Fairbanks and HCS, filed an amended complaint in the Warren County Court of Common Pleas against Phillip, Superior, and JMI. Mike and Wanda alleged that Phillip had breached fiduciary duties that he owed to them, defrauded them, misappropriated or converted their assets, and caused a loss in Fairbanks' and HCS' value as a result of his mismanagement of those companies.[1]
 {¶ 8} The case was tried to the bench. The trial court found that Phillip engaged in fraudulent conduct with respect to the labor swap and awarded Mike and Wanda $131,000 in damages as a result. The trial court also found that Phillip caused a number of expenses to be borne by Fairbanks that were incurred entirely or at least partially by Superior and awarded Mike and Wanda $170,700 for those expenses, giving them a total damages award of $301,700. The trial court rejected Mike and Wanda's claims for loss in value, punitive damages, and attorney fees.
 {¶ 9} Phillip appeals from the trial court's judgment, raising six assignments of error, and Mike and Wanda cross-appeal, raising three cross-assignments of error.
 {¶ 10} Assignment of Error No. 1: *Page 4 
 {¶ 11} "THE TRIAL COURT ERRED IN FINDING THAT PHILLIP HUBBELL PERPETRATED A FRAUD UPON APPELLEES WITH REGARD TO THE EXCHANGING OF LABOR BETWEEN RELATED COMPANIES."
 {¶ 12} Phillip argues the trial court's finding that he defrauded Mike and Wanda as a result of the labor swap between the parties' companies was against the manifest weight of the evidence. We disagree.
 {¶ 13} In civil cases, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. A reviewing court must presume that the findings of the trier-of-fact are correct since the trier-of-fact is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80-81.
 {¶ 14} "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Id. at 81.
 {¶ 15} To prove a claim for fraud, a plaintiff must show that (1) the defendant made a representation or, where there is a duty to disclose, concealed a fact; (2) which was material to the transaction at hand; (3) falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it was true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) the plaintiff justifiably relied upon the misrepresentation or fact concealed; and (6) sustained injury as a result. *Page 5 Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 475, 1998-Ohio-294.
 {¶ 16} Phillip argues that Mike and Wanda failed to demonstrate that he made a false representation to them regarding the labor swap. He asserts there was no evidence to support the trial court's finding that Mike or Wanda instructed him to discontinue the labor swap in early 2000, since Mike did not discuss the labor swap with him until he resigned from Fairbanks and HCS in October 2001, and Wanda's testimony shows that she did not forbid the labor swap, but only objected to the manner in which the employees were paid.
 {¶ 17} However, Wanda testified that sometime between October 1999 and February 2000, she told Phillip "there would be no more of this labor swapping" and instructed him to make sure that each employee was paid by the company for which the employee had performed the work. She further testified that Phillip initially agreed to this arrangement, but soon thereafter, returned to his past practice of swapping labor between the parties' companies without telling her or Mike that he had decided not to follow her instruction. Thus, there was evidence presented to show that Phillip made a false representation to Mike and Wanda regarding a material fact, i.e., the labor swap. See Williams, 83 Ohio St.3d at 475.
 {¶ 18} Phillip points out that at one point during her cross-examination, Wanda stated, "[W]e did not disagree with a labor swap. What we disagreed with was the way these people were paid." He asserts this statement proves that Wanda did not instruct him to discontinue the practice of labor swapping.
 {¶ 19} However, the trial court was entitled to interpret Wanda's testimony as meaning that while she and Mike did not disagree with the practice of swapping labor, per se, they did disagree with how Phillip was implementing it. Wanda's testimony made it clear that she and Mike strongly objected to Phillip's practice of assigning Fairbanks' employees to perform tasks for Superior when Superior was short-handed and having Superior receive *Page 6 
payment from AK Steel for that work, but then having Fairbanks pay all of the wages of their employees who had been temporarily assigned to work for Superior.
 {¶ 20} Furthermore, the evidence showed that Phillip concealed a fact from Mike and Wanda that he had a duty to disclose, to wit: his decision to disregard Wanda's instruction regarding the labor swap. Phillip owed a duty to Mike and Wanda to disclose this fact by virtue of his position as vice-president of Fairbanks and HCS, and their position as owners of those companies. See Geygan v. Queen City Grain Co. (1991),71 Ohio App.3d 185, 191 (a corporate officer occupies a position of trust in relation to his corporation); Leal v. Holtvogt (1998),123 Ohio App.3d 51, 76 (a person's duty to speak may arise from a fiduciary relationship); and Williams, 83 Ohio St.3d at 475 (plaintiff may prove first element of fraud claim by showing that defendant made a representation or, where there is a duty to disclose, concealed a fact).
 {¶ 21} Phillip also argues that Mike and Wanda failed to present sufficient evidence to show that he intended to deceive them. We disagree.
 {¶ 22} In proving a fraud claim, a person's intent to mislead another into relying on a misrepresentation or concealment of a material fact generally must be inferred from the totality of the circumstances since a person's intent is rarely provable by direct evidence. Leal,123 Ohio App.3d at 76.
 {¶ 23} In this case, Wanda twice told Phillip to end the practice of swapping labor among the companies' employees and to make sure that each employee was paid by the company for which the employee did the work. After initially agreeing to implement this instruction, Phillip refused to follow it and continued with the practice of swapping labor, which worked to Superior's benefit and to Fairbanks' detriment. The totality of the circumstances supports an inference that Phillip intended to deceive Mike and Wanda into *Page 7 
relying on his misrepresentation or concealment of a material fact with respect to the labor swap. Id.
 {¶ 24} The trial court was also entitled to accord little or no weight to the testimony of Phillip's expert who opined that Phillip did not fit the profile of or behave in a manner consistent with persons who commit fraud because "people don't steal money just to give it away." The fact that Phillip gave more money to charitable causes than Mike and Wanda did not compel the trial court to conclude that Phillip was incapable of defrauding his parents regarding the labor swap.
 {¶ 25} Phillip also contends that Mike and Wanda could not have justifiably relied upon him during the period in question because they knew he was dealing with a "severe brain dysfunction," i.e., a tumor in his pituitary gland that was surgically removed in late 1999 and early 2000, at the time they allegedly gave him the instruction regarding the labor swap, but did not follow up on his compliance with the instruction after he was feeling better. We find this argument unpersuasive.
 {¶ 26} "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties."Crown Property Dev., Inc. v. Omega Oil Co. (1996), 113 Ohio App.3d 647,657. The factors a court should consider include the nature of the transaction, the materiality of the representation or fact concealed, the parties' relationship, and their respective intelligence, experience, age, mental and physical condition, knowledge, and means of knowledge. Finomore v. Epstein (1984), 18 Ohio App.3d 88, 90. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." Crown Property Dev.,Inc.
 {¶ 27} The parties in this case, being parents and son, were, obviously, closely *Page 8 
related. Even though Mike and Phillip were not on speaking terms for a period during the events at issue, Phillip maintained contact with Wanda during this time. Mike and Wanda had named Phillip as vice-president of Fairbanks and HCS, and it clearly was not unreasonable for them to rely on Phillip to follow their instructions with regard to the labor swap.
 {¶ 28} Furthermore, even if Phillip's claim that he did not recover from his surgeries until July 2000 is accepted as true, the record shows that Phillip made no effort from July 2000 to July 2001 to disclose to Mike and Wanda that he had decided not to follow Wanda's instruction regarding the companies' labor swap.
 {¶ 29} Thus, the totality of the circumstances in this case shows that Mike and Wanda had no apparent reason to doubt the veracity of Phillip's representations regarding the labor swap or to believe that Phillip would conceal a material fact from them as to that practice. CrownProperty Dev., Inc., 113 Ohio App.3d at 657.
 {¶ 30} Phillip also contends that not only were Mike and Wanda not damaged by the labor swap, they actually benefited from it. However, while there was evidence to show that the labor swap was potentially beneficial to all of the parties' companies, there was also evidence to show that under Phillip's management, the practice soon began benefiting Superior to a significantly greater degree than Fairbanks. Specifically, Mike and Wanda presented substantial evidence showing they suffered actual harm in the amount of $131,000 as a result of their justifiable reliance on Phillip's misrepresentation or concealment of a material fact regarding the labor swap.
 {¶ 31} In light of the foregoing, Phillip's first assignment of error is overruled.
 {¶ 32} Assignment of Error No. 2:
 {¶ 33} "THE TRIAL COURT ERRED IN ITS FINDING OF THE AMOUNT OF *Page 9 
DAMAGES SUSTAINED BY APPELLEES FOR SAID FRAUD."
 {¶ 34} Phillip argues that even if Mike and Wanda suffered some injury from his alleged fraud, the trial court miscalculated the amount of damages to which they were entitled. We disagree.
 {¶ 35} Parties damaged by the wrongful conduct of others are entitled to be compensated for their loss by being made whole to the furthest extent possible. See Collini v. Cincinnati (1993), 87 Ohio App.3d 553,556. The amount of damages to be awarded is within the trial court's discretion, and the court's decision will be upheld if it is supported by sufficient, credible evidence and is not against the manifest weight of the evidence. Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 487.
 {¶ 36} Mike and Wanda, along with their expert, Gregory Toman, a certified public accountant, presented evidence showing that from January 2000 to October 2001, Fairbanks suffered $131,000 in losses stemming from Phillip's fraudulent conduct regarding the labor swap. Wanda calculated the amount of damages for 2001 by reviewing thousands of pages of Fairbanks' and Superior's original business records, including the companies'"labor books," which showed the jobs that each of the companies' employees did for every day of the year, as well as the companies' man hour sheets, payroll records, and invoices. After cross-checking the companies' invoices against their payroll records, Wanda concluded that Fairbanks' employees had performed 3,293 man hours of work for Superior in 2001 without Superior paying Fairbanks any compensation for those hours.
 {¶ 37} Toman testified that he reviewed Wanda's calculations for 2001 by tracing "a fair number" of them to the companies' original business records, and he "felt comfortable" with Wanda's methodology and the results of her analysis. Toman concluded that Fairbanks was owed 3,293.25 hours from January 2001 through October 2001 (when Phillip resigned *Page 10 
as vice-president of Fairbanks and HCS). He then multiplied the number of misappropriated hours by the companies' average pay rate for that year, which was $14.00 per hour, and added 15 percent "labor fringes" to account for miscellaneous labor expenses such as payroll taxes, Workers' Compensation benefits, and insurance, and arrived at the rounded amount of $53,000 in damages for misappropriated labor in 2001.
 {¶ 38} Wanda was unable to come to any firm conclusion about the amount of damages for 2000 since she did not have all of the business records available for that period, and therefore, she turned the matter over to Toman. After examining the records that were available for that year and utilizing a conservative approach, Toman determined that Superior owed Fairbanks $78,000 for misappropriated labor in 2000.[2]
The trial court found Wanda's and Toman's calculations credible and awarded $131,000 in total damages as a result of Phillip's fraudulent conduct regarding the labor swap (i.e., $78,000 for 2000 and $53,000 for 2001).
 {¶ 39} Phillip asserts Mike and Wanda's calculations are erroneous because they charged Superior "for all hours that Fairbanks paid its employees that were not billed to AK Steel, even though Superior did not benefit from those hours." The hours in question involved "shop time," which Phillip defines as "all time employees spent performing maintenance and administrative activities that could not be billed to AK Steel," and "down time," which he defines as "all time employees spent standing around waiting for another contractor to complete a job," which could not be billed to AK Steel either. Phillip contends *Page 11 
that he, Superior and JMI did not benefit from these hours, and that Mike, Wanda, Fairbanks, and HCS were not harmed by paying for these hours because these hours exist even without the labor swap. We find this argument unpersuasive.
 {¶ 40} Despite his assertions to the contrary, Phillip, Superior, and JMI benefit from the shop time hours that are spent performing administrative and maintenance duties. Moreover, Phillip has failed to present a convincing argument as to why he, Superior, and JMI should not have to shoulder some of the burden of paying for the down time hours.
 {¶ 41} Phillip argues that down time hours are a normal occurrence for businesses like Fairbanks and comprise part of those businesses' costs of doing business. However, the same holds true for Superior. Therefore, the trial court's decision to charge Superior for shop time and down time in calculating Mike and Wanda's damages was not an abuse of discretion, and the amount of damages the trial court awarded to Mike and Wanda was not against the manifest weight of the evidence.Krug, 136 Ohio App.3d at 487.
 {¶ 42} Consequently, Phillip's second assignment of error is overruled.
 {¶ 43} Assignment of Error No. 3:
 {¶ 44} "THE TRIAL COURT ERRED IN AWARDING DAMAGES FOR WHICH IT HAD NO CORRESPONDING FINDING OF A CAUSE OF ACTION UPON WHICH SAID DAMAGES COULD BE AWARDED."
 {¶ 45} Assignment of Error No. 4:
 {¶ 46} "THE TRIAL COURT ERRED IN ITS FINDING AS TO DAMAGES WHERE THERE WAS NO EVIDENCE TO SUPPORT SAME."
 {¶ 47} Phillip's third and fourth assignments of error are interrelated and therefore will be addressed together.
 {¶ 48} Phillip argues the trial court erred in awarding Mike and Wanda $170,700 for *Page 12 
various items without making a related finding that he was liable to Mike and Wanda under any cause of action. He further argues that even if there was an underlying cause of action to support an award of damages for those items, the amount of damages awarded by the trial court is not supported by the evidence. We disagree with both arguments.
 {¶ 49} The trial court found that Phillip (1) caused equipment belonging to Fairbanks and HCS to be used by Superior without paying Fairbanks and HCS for its use, and (2) charged expenses to Fairbanks that should have been charged entirely or at least partially to Superior. As a result, the trial court ordered Phillip to pay Mike and Wanda (1) $19,400 for Superior's use of Fairbanks' man lifts; (2) $63,800 for Superior's use of Fairbanks'"vacuum trucks," which the parties refer to as "vac trucks"; (3) $4,500 for safety shoes; (4) $10,000 for gasoline; (5) $12,000 for lead abatement costs; (6) $10,000 for uniforms; (7) $3,000 for baseball tickets; (8) $15,000 for attendance bonuses; and (9) $33,000 for a "safety man." The amounts awarded total $170,700.
 {¶ 50} The trial court expressly stated that it did not find Phillip's conduct to be fraudulent with respect to these unpaid fees and expenses. Regrettably, however, the trial court failed to specify the legal theory under which it found Phillip liable for these fees and expenses.
 {¶ 51} Mike and Wanda contend that the trial court awarded these damages pursuant to their claim for conversion set forth in the ninth cause of action of their amended complaint. However, the question of whether the unpaid fees and expenses are the proper subjects of a conversion action is problematic.
 {¶ 52} "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." Dice v. White Family Cos., 173 Ohio App.3d 472,477, 2007-Ohio-5755, ¶ 17. "Typically, `[t]he elements of *Page 13 
a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" Id., quoting Haul Transport ofVA, Inc. v. Morgan (June 2, 1995), Montgomery App. No. 14859.
 {¶ 53} "`An action alleging conversion of cash lies only where the money involved is `earmarked' or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum.'"Morgan, Montgomery App. No. 14859, quoting Gray v. Liberty Nat. LifeIns. Co. (Ala. 1993), 623 So.2d 1156, 1160. See, also, Dice,2007-Ohio-5755 at ¶ 17.
 {¶ 54} Furthermore, "[a]n action will not lie for the conversion of a mere debt or chose in action. [A `chose in action' is the right to bring an action to recover a debt, money or thing owed by another. Black's Law Dictionary (8th Ed. 2004), 258.] Consequently, where there is no obligation to return identical money, but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." Morgan, citing 18 American Jurisprudence 2d (1985) 151, Conversion, Section 8.
 {¶ 55} In this case, Mike and Wanda's conversion action regarding the nine items in question appears to be an action for conversion of cash or a mere chose in action, as Mike and Wanda were not seeking specific money that was earmarked for them, but only the cash equivalent thereof. Thus, there are significant doubts as to whether the nine items are the proper subjects of a conversion action. See, e.g., Dice, 2007-Ohio-5755
at ¶ 17, and Morgan, Montgomery App. No. 14859. Nevertheless, the trial court was justified in awarding damages for the nine items under a claim for unjust enrichment, which Mike and Wanda raised in the *Page 14 
tenth cause of action of their amended complaint.
 {¶ 56} "Unjust enrichment occurs `"when a party retains money or benefits which in justice and equity belong to another."' (Citations omitted.) `Under the doctrine of unjust enrichment * * *, a party may recover the reasonable value of services rendered in the absence of an express contract if denying such recovery would unjustly enrich the opposing party.' (Citation omitted.) In order to recover on a claim of unjust enrichment, the party asserting the claim must demonstrate `(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.' (Citation omitted.)" Dailey v. Craigmyle Son Farms,L.L.C., 177 Ohio App.3d 439, 2008-Ohio-4034, ¶ 20.
 {¶ 57} In this case, there was evidence presented to support the trial court's findings that Phillip and Superior improperly failed to pay Fairbanks or HCS for Superior's use of their man lifts and vac trucks, and improperly charged Fairbanks or HCS with a number of expenses that were incurred entirely or partially by Superior. This evidence was sufficient to demonstrate that benefits had been conferred by Mike and Wanda upon Phillip, with Phillip's knowledge, and that it would be unjust to allow Phillip to retain those benefits without paying for them. Id. There was also sufficient evidence presented to show that the amounts the trial court awarded Mike and Wanda for the nine items in question, totaling $170,700, constituted the "reasonable value" of those items. Id.
 {¶ 58} Phillip contends "[t]here is absolutely no evidence" that he, Superior, or JMI "gained any benefit" from the vac trucks or that he caused Mike and Wanda any harm by using them. We disagree.
 {¶ 59} Mike and Wanda's expert, Gregory Toman, testified that Fairbanks' expenses *Page 15 
for the rental of vac trucks from 1999 to 2002 were as follows: zero dollars in 1999; $83,000 in 2000; $23,346 in 2001; and $9,495 in 2002. Noticing the unusually large amount of expense for renting vac trucks in 2000, Toman looked at Fairbanks' and HCS' financial statements for 1999, 2000, and 2001 to see how much they paid for that expense in those years. Toman also discussed with Mike and Wanda what kind of jobs they had for those years that required the use of vac trucks.
 {¶ 60} Toman observed that in 2000, Fairbanks billed $64,000 to A.K. Steel for jobs requiring the use of vac trucks. Toman determined from Fairbanks' records that traditionally, 30 percent of the billings for jobs requiring the use of vac trucks went towards the costs of renting the vac trucks. Therefore, Toman determined that Fairbanks' expenses for renting vac trucks in 2000 should have been only $19,200 (i.e., 30 percent of the $64,000 billed to A.K. Steel) rather than the $83,000 that Fairbanks actually paid for that expense.
 {¶ 61} As a result, Toman asserted that Phillip owed Mike and Wanda $63,800, which represents the difference between the amount they should have paid to rent vac trucks in 2000 ($19,200) and the amount they actually paid ($83,000). The trial court agreed with this assertion, and since there is evidence to support the trial court's finding on this matter, it cannot be reversed as being against the manifest weight of the evidence. C.E.Morris, 54 Ohio St.2d 279, syllabus.
 {¶ 62} Phillip also argues there was no evidence to support a finding that Superior ever used one of Fairbanks' man lifts without paying for it. Again, we disagree.
 {¶ 63} Toman testified that Fairbanks and HCS suffered $19,400 in damages from Superior's use of their man lifts without reimbursement. He arrived at this amount by examining payment records and specific invoices that Superior sent to AK Steel for the work they performed for them. Wanda also testified on the issue of Superior's use of Fairbanks' *Page 16 
man lifts, stating that her review of the records from 1999 and 2001 showed that Superior used Fairbanks' man lifts weekly to clean AK Steel's crane windows.
 {¶ 64} Phillip also contends "there is no evidence that [Mike and Wanda] suffered harm at the hands of [him], Superior, or JMI concerning the safety shoes, gasoline, abatement costs, uniforms, baseball tickets, attendance bonuses, or safety man." However, by being forced to pay for expenses that Fairbanks and HCS did not incur, Mike and Wanda did, in fact, suffer harm at the hands of Phillip, Superior, and JMI, and it would be unjust to allow Phillip to retain the benefits he received without payment. Dailey, 177 Ohio App.3d 439, 2008-Ohio-4034 at ¶ 20.
 {¶ 65} Consequently, Phillip's third and fourth assignments of error are overruled.
 {¶ 66} Assignment of Error No. 5:
 {¶ 67} "THE TRIAL COURT ERRED IN PERMITTING APPELLEES' EXPERT TO TESTIFY AS TO DAMAGE FIGURES UPON AN INADEQUATE FOUNDATION."
 {¶ 68} Phillip argues the trial court erred in permitting Toman to testify regarding the amount of damages Mike and Wanda sustained as a result of Phillip's alleged misconduct because the expert's testimony was not based upon his personal knowledge, facts in the record, or admissible evidence. We disagree.
 {¶ 69} Mike and Wanda presented extensive evidence regarding their claims, which provided a factual foundation for Toman's testimony regarding the labor swap and the nine items discussed in Phillip's third and fourth assignments of error. Toman testified that he checked the calculations Wanda made on her work sheets by comparing them to the original records, and stated that he was comfortable with the accuracy of her work.
 {¶ 70} Because it appears that Phillip's objections to Toman's testimony are largely directed at the weight to be given that testimony rather than its admissibility, we conclude that *Page 17 
the trial court did not abuse its discretion or otherwise err in refusing to exclude Toman's expert testimony.
 {¶ 71} Consequently, Phillip's fifth assignment of error is overruled.
 {¶ 72} Assignment of Error No. 6:
 {¶ 73} "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR A DIRECTED VERDICT AT THE CLOSE OF THE PLAINTIFF'S CASE AND AT THE CONCLUSION OF THE EVIDENCE."
 {¶ 74} Phillip argues the trial court erred in overruling his motions for a directed verdict made at the close of Mike and Wanda's case and the close of all evidence. We disagree.
 {¶ 75} Initially, Phillip cited the wrong rule of civil procedure when he moved for a directed verdict pursuant to Civ. R. 50(A), since a motion for a directed verdict is inappropriate in bench trials. Pacher v.Invisible Fence of Dayton, 154 Ohio App.3d 744, 2003-Ohio-5333, ¶ 28. When a motion for a directed verdict is made in a non-jury trial like the present case, the motion is construed as a motion for involuntary dismissal under Civ. R. 41(B)(2). Pacher. However, even when Phillip's motion for a directed verdict is construed as a motion for an involuntarily dismissal, he still was not entitled to have Mike and Wanda's case involuntarily dismissed pursuant to Civ. R. 41(B)(2).
 {¶ 76} Civ. R. 41 (B)(2) explicitly states that after a defendant moves to dismiss a case, the court, "as trier of the facts may then determine [the facts] and render judgment against the plaintiff or may decline torender any judgment until the close of all of the evidence." (Emphasis added.) Pacher, 2003-Ohio-5333 at ¶ 33. Thus, when a motion for an involuntary dismissal is made in a non-jury action, the trial court can choose either to dismiss the action or to proceed with further evidence. Id. at ¶ 34.
 {¶ 77} When the trial court in this case overruled Phillip's motion for a directed verdict *Page 18 
at the close of Mike and Wanda's case, the court effectively chose the second option presented in Civ. R. 41(B)(2), i.e., the court declined "to render any judgment until the close of all the evidence." Because Civ. R. 41(B)(2) expressly allows this choice, the trial court did not err in overruling Phillip's motion made at the close of Mike and Wanda's case. See Pacher at ¶ 34.
 {¶ 78} Furthermore, the trial court did not err in overruling Phillip's motion for a directed verdict (which should have been a motion for involuntary dismissal) at the close of all evidence, since the trial court found that Mike and Wanda presented sufficient evidence to prove several of their claims, and a review of the evidence shows that the trial court's decision as to those claims was not contrary to the sufficiency or manifest weight of the evidence.
 {¶ 79} Accordingly, Phillip's sixth assignment of error is overruled.
 {¶ 80} Cross-assignment of Error No. 1:
 {¶ 81} "THE TRIAL COURT ERRED IN RULING THAT PHILLIP HAD NOT BREACHED HIS FIDUCIARY DUTIES."
 {¶ 82} Mike and Wanda argue the trial court erred in finding that Phillip did not breach his fiduciary duty to refrain from self-dealing when he accepted work assignments from AK Steel that AK Steel formerly had given to Fairbanks. We disagree.
 {¶ 83} "To succeed on a claim for breach of fiduciary duty, a party must show: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." Estate Planning Legal Services, P.C.v. Cox, Butler App. Nos. CA2006-11-140, CA2006-12-141, 2008-Ohio-2258, ¶ 44, citing Strock v. Presnell (1988), 38 Ohio St.3d 207, 217.
 {¶ 84} Mike and Wanda contend the trial court improperly inserted a defense or *Page 19 
excuse to the second element of a cause of action for breach of fiduciary duty by allowing Phillip to raise as a defense the conduct of a third party, namely, AK Steel. However, it is apparent from its decision that the trial court did not add a defense or excuse to the second element of a breach of fiduciary duty claim; rather, the trial court found that Mike and Wanda failed to establish the third element of their claim for breach of fiduciary duty, requiring them to show they sustained an injury proximately caused by Phillip's breach of a fiduciary duty. Id.
 {¶ 85} Specifically, the trial court found that the work assignments from AK Steel, which Mike and Wanda's companies (Fairbanks and HCS) lost, would have been lost to them even if Phillip's companies, Superior and JMI, had not agreed to take them. Therefore, the trial court concluded that the business Fairbanks and HCS lost was not proximately caused by any breach of fiduciary duty on Phillip's part, but rather, by AK Steel's decision not to do as much business with Fairbanks and HCS as it once did.
 {¶ 86} In arriving at this conclusion, the trial court acknowledged that it "may seem curious" that AK Steel would take this action, especially in light of the fact that AK Steel had not shown any previous dissatisfaction with Fairbanks' performance. Nevertheless, the trial court found that the proposal to give the work to Superior rather than Fairbanks originated with AK Steel, and there is evidence in the record to support the trial court's finding.
 {¶ 87} For instance, there was testimony showing that in October 1999, Phillip was approached by an official at AK Steel named Cleo Adams, who told Phillip that he wanted Superior to clean the companies' crane windows. Phillip told Adams that cleaning the crane windows had been Fairbanks' job for the last two years. Adams then told Phillip that he had received a directive from upper management to classify AK Steel's outside contractors into groups according to their specialty. As a result, Superior was classified as a "labor group," *Page 20 
making it eligible to clean crane windows, while Fairbanks was classified as a cleaning contractor, rendering it ineligible to perform that task. Adams told Phillip that if he did not take the crane window cleaning job, he was going to give it to someone other than Fairbanks. Consequently, Phillip decided to take the work for Superior. Adams also testified that Phillip did nothing to cause Fairbanks to lose the crane window cleaning job or any other job at AK Steel.
 {¶ 88} The trial court, which was in the best position to decide this matter, found Phillip's and Adam's testimony credible on these matters. Therefore, the trial court's decision cannot be reversed as being against the manifest weight of the evidence. Seasons Coal Co.,10 Ohio St.3d at 80-81.
 {¶ 89} Consequently, Mike and Wanda's first cross-assignment of error is overruled.
 {¶ 90} Cross-assignment of Error No. 2:
 {¶ 91} "THE TRIAL COURT ERRED IN RULING THAT PHILLIP IS NOT LIABLE FOR LOSS OF VALUE."
 {¶ 92} Mike and Wanda argue the trial court erred in ruling against their claim for damages regarding Fairbanks' and HCS' loss in value, which they contend was caused by Phillip's fraudulent mismanagement of those companies. This argument lacks merit.
 {¶ 93} In November 2004, Mike and Wanda sold Fairbanks and HCS to MPW, Inc. for $860,000, which Mike and Wanda claim was at least one million dollars less than what they would have received had it not been for Phillip's fraudulent mismanagement. In support, they point to evidence that in 1998, MPW had offered to pay $1.75 million for Fairbanks and HCS, but in 2004, MPW would only agree to pay $860,000 to purchase those companies.
 {¶ 94} However, there was evidence presented showing that MPW considered Phillip's management skills to be a major asset of Fairbanks and HCS, as MPW made its *Page 21 
1998 offer contingent upon Phillip's continuing with those companies or his agreeing to sign a non-competition clause, both of which he refused to do. Because there was evidence to support a finding that the companies' reduction in value was caused by circumstances other than Phillip's actions, the trial court did not abuse its discretion or otherwise err in refusing to award Mike and Wanda damages for Fairbanks' and HCS' loss in value.
 {¶ 95} Therefore, Mike and Wanda's second cross-assignment of error is overruled.
 {¶ 96} Cross-assignment of Error No. 3:
 {¶ 97} "THE TRIAL COURT ERRED BY DENYING PUNITIVE DAMAGES AND ATTORNEYS' FEES."
 {¶ 98} Mike and Wanda argue the trial court erred in denying their request for punitive damages and attorney fees. This argument also lacks merit.
 {¶ 99} The trial court overruled Mike and Wanda's requests for punitive damages and attorney fees after finding that (1) while Phillip's mismanagement of the companies' practice of labor swapping was fraudulent, his conduct was not motivated or aggravated by malice or ill-will, and was not sufficiently gross or egregious to justify an award of punitive damages; (2) while Phillip caused equipment belonging to Fairbanks and HCS to be used by Superior without Superior's paying for it, and charged expenses to Fairbanks and HCS that should have been charged entirely or at least partially to Superior, this conduct wasnot fraudulent; and (3) because it had decided not to award Mike and Wanda punitive damages, it would not award them attorney fees either.
 {¶ 100} A review of the record shows that the trial court did not abuse its discretion or otherwise err in overruling Mike and Wanda's request for punitive damages or attorney fees under the circumstances of this case. See Padgett v. Sanders (1998), 130 Ohio App.3d 117, 121, quoting Charles R. Combs Trucking, Inc. v. Interntl. Harvester Co.
(1984), *Page 22 12 Ohio St.3d 241, paragraph three of the syllabus.
 {¶ 101} Accordingly, Mike and Wanda's third cross-assignment of error is overruled.
 {¶ 102} Judgment affirmed.
WALSH, P.J., and BRESSLER, J., concur.
[1] Approximately one month after filing their amended complaint, Mike and Wanda sold their interests in Fairbanks and HCS for $860,000. In 1998, Mike and Wanda had received an offer of $1.75 million to purchase those companies.
[2] Toman arrived at the $78,000 total by applying the number of misappropriated regular hours in 2000, which he determined to be 3,997 hours, by an average pay rate of $12 per hour, and then adding 15 percent of that amount for labor fringe expenses, for an approximate subtotal for regular hours of $55,000. He then multiplied the number of misappropriated overtime hours (739.09) by an average overtime pay rate of $18.00 and then added 15 percent to that amount for labor fringe expenses, for an approximate subtotal for overtime hours of $15,000. Adding these subtotals together, Toman came to a figure of $70,000, to which Toman added $8,000 for holiday and vacation pay for the workers from Fairbanks and HCS whose services Phillip, Superior, and JMI utilized during 2000, for a total of $78,000 in damages for misappropriated labor for 2000. *Page 1