[Cite as *Costaras v. Gilson*, 2022-Ohio-4011.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| JANICE COSTARAS, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 111225 |
| v. | : | |
| THOMAS P. GILSON, ET AL., | : | |
| Defendants-Appellees. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 10, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-933064

## *Appearances:*

Dean DePeiro and Kelly Zacharias, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jillian Eckart, Assistant Prosecuting Attorney, *for appellees*.

LISA B. FORBES, J.:

## I. Facts and Procedural History

{¶ 1} On January 14, 2020, Dr. George Costaras ("Dr. Costaras" or "George") was found deceased on the ground beneath the Brookpark Road bridge in the Cleveland Metroparks in Fairview Park, Ohio. Dr. Elizabeth Mooney, a

pathologist at the Cuyahoga County Medical Examiner's Office (collectively the "Medical Examiner"), conducted an autopsy the next day and issued a report on February 12, 2020, determining that Dr. Costaras "jumped from the Brookpark bridge to the ground below, where he then collapsed and subsequently expired." The Medical Examiner's verdict listed the cause of death as "blunt force injuries" and the manner of death as "SUICIDE."

{¶ 2} Dr. Costaras's wife, Janice Costaras ("Janice"), individually and as executor of the Estate of Dr. Costaras, filed a complaint against the Medical Examiner challenging the Medical Examiner's verdict regarding the cause and manner of Dr. Costaras's death pursuant to R.C. 313.19. Specifically, the complaint states that Janice is "seeking a judicial order directing the Medical Examiner of Cuyahoga County to change the cause of death set forth in the Certificate of Death and Supplementary Medical Examiner's Verdict from 'Blunt force injuries — SUICIDE' to 'Blunt force injuries — UNDETERMINED.'"

{¶ 3} On October 5, 2021, the court held a bench trial, and after Janice rested her case, the Medical Examiner moved to dismiss pursuant to Civ.R. 41(B)(2). The court granted the motion to dismiss. On January 20, 2022, the court issued findings of fact and conclusions of law, which stated in pertinent part that

> the Medical Examiner's ruling on the cause and manner of death for * * *Dr. * * * Costaras as "blunt force injuries" — suicide is based upon substantial evidence. * * * [Janice] cannot meet her burden of proof by simply arguing that [the Medical Examiner] should have pursued additional avenues of investigation regarding the manner of death. [Janice] failed to provide any credible evidence at Trial that would support any other manner of death ruling.

{¶ 4} It is from this order that Janice appeals. After reviewing the facts of the case and pertinent law, we affirm the lower court's judgment.

## II. Stipulations

{¶ 5} At the outset, the parties stipulated to three depositions. Dr. Othman A. Shemisa ("Dr. Shemisa") testified that he is a primary care physician and most recently worked at University Hospitals until he retired in September 2019. He was George's primary care physician for "at least 10 years." Dr. Shemisa treated George for hypertension, hyperlipidemia, and elevated blood sugar. In April 2016, George saw Dr. Shemisa for anxiety and feeling "stressed out." Dr. Shemisa prescribed Alprazolam after George decided against counseling. Dr. Shemisa noted that George's mood was "slightly anxious" and his affect was "slightly nervous." Dr. Shemisa diagnosed George with "direct anxiety, social anxiety, situational anxiety." Additionally, at an October 2018 appointment, George complained about not being able to sleep.

{¶ 6} George's Alprazolam prescription continued through his final appointment with Dr. Shemisa, which was in April 2019. Additionally, Dr. Shemisa refilled the prescription on August 30, 2019, prior to his retirement. Dr. Shemisa testified that it was "surprising, truly" to learn that the Medical Examiner determined that George committed suicide, because his records "don't indicate a person who was severely depressed * * *."

{¶ 7} Dr. James Thomas Kelly, Jr. ("Dr. Kelly") testified that he is a "primary care provider, family practice doctor" at University Hospitals, Olmsted

Falls Family Practice Clinic. Dr. Kelly testified from his notes regarding the only patient visit he had with George, on November 18, 2019, because he did not recall the specifics of the appointment. According to Dr. Kelly's notes, he saw George for the following reasons: hypertension, depression with anxiety, high cholesterol, and hyperglycemia. Dr. Kelly prescribed George Wellbutrin and renewed his Alprazolam prescription because of "a great deal of stress that he was under." He noted that George was "not homicidal, * * * not suicidal, but would like to possibly go on something." Dr. Kelly recommended that George make a follow-up appointment with him in four-to-six weeks, to see how he was tolerating the Wellbutrin.

{¶ 8} Dr. Sandra Lynn Darling ("Dr. Darling") testified that she is a doctor of osteopathy at the Cleveland Clinic Wellness and Preventative Medicine Department. Dr. Darling met with George on January 7, 2020. Janice also attended this appointment. According to Dr. Darling, the chief complaint was George's stress. George was not sleeping well, and he said to her, "that he's been under a lot of stress for the past two to three months related to his business" and "[d]ue to finances." Dr. Darling testified that George "had anxiety a couple years ago" and "took Alprazolam once in awhile." George also told Dr. Darling that he lost 10-15 pounds in the last six weeks because he had no appetite, and he stopped exercising because he was "afraid exercise will cause more weight loss, and also doesn't want to take the time to do it."

{¶ 9} Dr. Darling also testified that George had been prescribed Wellbutrin approximately six weeks prior to his appointment with her. She "assumed it was because he was experiencing depression, stress, and anxiety." George further reported to Dr. Darling that he "wasn't able to sleep at all while on Prozac a few years ago" and that "he was seeing a therapist in the past and stated it was helpful." Dr. Darling asked George if he was depressed, and he said, "Yes." She also asked him if he suffered from anxiety, and he said, "Yes."

{¶ 10} Dr. Darling asked George "what he had done in the past to treat his anxiety and depression and what he's willing to do." George answered that he "really didn't want to do anything" because he was worried about losing his medical license "if he receives treatment for mental health." Dr. Darling diagnosed George with "hypertension, uncontrolled due to high stress"; sleep difficulties, for which she prescribed him Trazodone; and anxiety and depression. She also recommended meditation, acupuncture, herbal supplements, essential oils, mind-body therapy, and gentle physical therapy.

{¶ 11} Dr. Darling testified that George did not "make any statements about wanting to end his life[,] suicidal thoughts[,] or wanting to harm himself in any way." After she met with him on January 7, 2020, she did not have "any concern that that would be something that he might do at some point." Dr. Darling testified that, although it is not her area of expertise, "based on [George's] symptoms, he was exhibiting signs of depression."

### III. Hearing Testimony

{¶ 12} Janice testified that she married George in 1978 and they were married 41 and one-half years at the time of his death. George had a healthy lifestyle, watching what he ate and working out. In December 2019, he cut back his workouts. According to Janice, George lost "10 to 15 pounds in the past eight weeks because he ha[d] no appetite."

{¶ 13} Janice testified that George was under a doctor's care for high blood pressure and sleep apnea. Asked what she knew about George's diagnosis of depression, Janice said, "You know, depression is not a word that's in our environment. * * * We are not depressed."

{¶ 14} Janice testified that George saw Dr. Darling for his sleep apnea. Janice further testified that she was surprised to learn that Dr. Shemisa diagnosed George with situational anxiety and prescribed him Alprazolam in 2016.

{¶ 15} According to Janice, George's podiatry business was "down" but the insurance "reimbursements have been down since we were married." Asked if George seemed "stressed out" about this, Janice testified as follows: "I wouldn't use the word stress. I would use the word nervous, worried. Because it just — I guess it just didn't seem fair. Do more, get paid less." Janice testified that they had no mortgage on their home in Westlake, and their net worth was estimated at $2.5 million at the time of George's death. They purchased a new car on December 31, 2019, and it was the largest debt the couple had at the time of George's death.

{¶ 16} Janice and George had plans to spend the day together on Tuesday, January 14, 2020. Janice called George's office and asked to have George's appointments for that day cancelled or rearranged. George usually worked late on Mondays, until "6 or 7." However, on Monday January 13, 2020, he stayed at work until after 10:00 p.m. According to Janice, George "wanted to get all the paperwork done because he was not coming in the next day, and he wanted to make sure he was fresh with what he had to write down for the patients."

{¶ 17} Janice spoke to George at 11:00 p.m. that night after he left his office. George went to the gas station and the bank to make a deposit of that day's income. He told Janice he would see her in ten minutes. At midnight, George was not home and Janice began to worry. She called the police and drove around looking for him. She came back home, unsuccessful in her attempts to locate George. At about 2:00 a.m., two Westlake police officers came to her house and told her that her "husband jumped off a bridge and committed suicide."

{¶ 18} Janice testified that, in the weeks leading up to January 13, 2020, the only thing "unusual" about George was that "he was worried because he was in his 60s, he knew he should retire, but the fact is he really didn't want to. And so that — that bothered him that he wasn't aligned with a lot of our friends." Asked if he seemed depressed, Janice answered, "No. No, no, no."

{¶ 19} Nicholas Costaras ("Nicholas") testified that George was his father and they had a close relationship. The two would often work out together, talk on the phone, and spend time with family. Asked if his father ever discussed suicide

with him "in the context of religion," Nicholas answered, "In the context of religion, maybe I recall over the years it was just a no, like it doesn't compute in our faith. And if we do it, then it would not allow us to get into heaven; and therefore, it was not a possibility."

{¶ 20} Nicholas testified that he "took over the managerial elements" of his father's business. In "the years or so leading up to his passing," he and his father talked about "preparing to make the [podiatry] practice attractive for his retirement, which from the conversations we had, he was anticipating one to three years at that time." According to Nicholas, the "business was very strong," although the "patients were up and the insurance reimbursements were dropping slightly."

{¶ 21} According to Nicholas, on January 14, 2020, he got a call from his mother "sometime after 2:00 a.m. and I just had that sinking feeling that something was wrong. * * * I could barely make out what she was saying. She said come home. And I asked is everything okay or what's wrong. She wouldn't say. And then I asked if my father was alive and she said no."

{¶ 22} According to Nicholas, he went to his parents' house and the police were already there. Nicholas testified that a detective was asking "questions to kind of find the justification of, I guess, what he was making it seem like was a foregone conclusion * * * that my father had jumped."

{¶ 23} Asked if his father had any change in his behavior prior to his death, Nicholas answered, "Nothing seemed odd, nothing that I can recall seemed any different than normal." His father "never" said anything about being depressed or

wanting to end his life.  Nicholas knew that his father "sought the services of a wellness counselor about a week before he passed away."

{¶ 24} Asked on cross-examination if he was aware that his father took the anti-anxiety and antidepressant medications Wellbutrin, Alprazolam, and Prozac "over the course of the past several years," Nicholas answered, "At the time I was not aware of that."  Asked if he knew his father had been diagnosed with situational anxiety and depression, Nicholas said, "I did not know that * * * That's news to me."

{¶ 25} Margaret Costaras ("Margaret") testified that she has a "very close" relationship with her family and had a "fantastic" relationship with her father George before he passed.  Asked if she noticed any changes in her father's behavior prior to his death, Margaret answered as follows:  "I did not notice any changes in those behaviors.  We got together quite frequently because it was the holidays, including my birthday.  He did vocalize to needing a nap during Christmas, that he wasn't sleeping through the night, so he seemed a little quieter because he was tired, but nothing drastically different from how long I have known him."  Asked, "in the weeks to days leading up to his death, did he ever tell you he was depressed or sad," Margaret answered, "No, he never used that word."

{¶ 26} Margaret testified that she did not know that her father had been diagnosed with anxiety and depression or that he was on medication for these conditions.  In the early morning hours of January 14, 2020, Margaret received a call from her mother, who whispered into the phone, "Come now."  When she arrived at her parents' house, the police were there and an officer told her that her

father was dead. According to Margaret, she said, "I don't understand." One of the police officers told her that her father "jumped from a bridge." Margaret testified that, at that time, she "had no reason to disbelieve the police." Asked if her father "ever [made] any statements that would give you alarm that he may try to harm himself," Margaret answered, "No, never."

{¶ 27} Margaret testified that, a few days after her father's death, she "was very concerned [about] the area that [he] was last in. * * * I am very aware of the violent crimes that were occurring." She and her family called one of the detectives and expressed their concerns. "[H]is response to us was that the ME's Office had closed the case and that his hands were tied and we had to pursue it further with them and to inquire with them about our concerns."

{¶ 28} Paul Baeppler ("Baeppler") testified that he is a licensed private investigator and a lieutenant with the Cleveland Division of Police. The Costaras family hired him to "take a look at the suicide. Alleged suicide." He has been involved in "well over a hundred" suicide investigations in his career. As part of the investigation in the case at hand, Baeppler reviewed the police report, including a diagram or drawing of the scene, the Medical Examiner investigator's report, and George's toxicology report from the Medical Examiner. He also went to the scene, interviewed the detective, and interviewed Janice.

{¶ 29} Baeppler testified about what he believed should have been, but was not, looked into regarding this investigation. According to Baeppler, he would have searched for "possible surveillance video cameras in the area that may have had a

line of sight either directly or indirectly of where the incident happened * * *." Baeppler clarified that he did not have the "subpoena power" to investigate whether any cameras "were pointed and in what direction, if they were operational, what the zoom capabilities of them were." Baeppler identified several different cameras in the area that may have captured "activity that happened on the bridge" that night.

{¶ 30} Additionally, Baeppler testified that it would have been "potentially" valuable for the police to contact the "motorist who called the Fairview Police Department to report an inoperable vehicle on the bridge" that night. "It would be one of those leads or clues that I think that I would want my officers or myself to follow-up on, follow it up to its ultimate conclusion, whatever it could be. It may lead to something, it may not."

{¶ 31} Baeppler also opined that he would have done "forensic investigation or network investigation" on Dr. Costaras's cell phone, home computer, and work computer "to see if he had been having communications with any persons * * * in the time period * * * before this. You would want to know if anybody had made any threats to him." He also would have been "interested in any kind of searches [Dr. Costaras] may have done on the internet * * *." According to Baeppler, there might have been information on Dr. Costaras's phone regarding "if he was in distress * * *[,] if he was having personal problems, marital problems, * * * if he was having legal problems, financial problems."

{¶ 32} Baeppler testified in summary as follows: "From what I know and from what my experience is as a police officer, I think that there were a few steps

that could have possibly been missed. * * * I don't think that they ran down every lead to its ultimate conclusion." Baeppler testified that it was "my guess or my opinion" that the police assumed it was a suicide from the beginning.

{¶ 33} On cross-examination, Baeppler testified that he did not conduct a forensic analysis of any of Dr. Costaras's electronic devices. He informed the Costaras family that these options were available, but "it wasn't something that they wanted investigated." Baeppler further testified that he did not know if the video cameras he identified in the area were there on January 14, 2020, he did not inquire whether any of the cameras were operational, and he did not request any footage from that night.

{¶ 34} Baeppler testified that he had no evidence that Dr. Costaras's death involved "foul play," that it was a homicide or accident, or that George died of natural causes. Asked if he had "any evidence that suggested any other manner of death other than suicide," Baeppler answered as follows: "No, I don't have any direct evidence that there was anything other than that. But I do believe that an investigator has an obligation to rule those other issues out or the fact that this wasn't staged in some way. I think that that would be part of — a lot of the part of the investigation."

{¶ 35} After Janice rested her case, the state moved for dismissal under Civ.R. 41(B)(2), arguing that she did not provide "the preponderance of evidence she needs to provide competent, credible evidence that the law requires in order to overturn the medical examiner's ruling." In granting this motion, the court found

that "speculation as to what could have been done in the law enforcement investigation does not rise to the burden of proof required to rebut the presumption of the validity of a coroner's report."

## IV. Law and Analysis

### A. R.C. 313.19 Coroner's Verdict

{¶ 36} R.C. 313.19, which is entitled "Coroner's verdict the legally accepted cause of death," states as follows:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

{¶ 37} In *Vargo v. Travelers Ins. Co.,* 34 Ohio St.3d 27, 30, 516 N.E.2d 226 (1987), the Ohio Supreme Court held that "the coroner's factual determinations concerning the manner, mode and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary."

### B. Civ.R. 41(B)(2) Dismissal

{¶ 38} Civ.R. 41(B)(2) governs involuntary dismissals in nonjury actions, and states, in part, as follows:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is

not granted, may move for a dismissal on the ground that upon the facts and law the plaintiff has shown no right to relief.

## C. Standard of Review

{¶ 39} This court has recently set forth the trial court's role in ruling on a Civ.R. 41(B)(2) motion to dismiss:

> "to weigh the evidence, resolve any conflicts therein, and render judgment for the defendant if the plaintiff has shown no right to relief." * * * Under Civ.R. 41(B)(2), the trial court does not view the evidence in the light move favorable to the plaintiff. * * * The trial court's only consideration in ruling on a motion for involuntary dismissal is "'whether [the] plaintiff has made out [her] case by a preponderance of the evidence.'"

*Holliday v. Calanni Enters.*, 2021-Ohio-2266, 175 N.E.3d 663 ¶ 18 (8th Dist.), quoting *Bank One, Dayton, N.A. v. Doughman*, 59 Ohio App.3d 60, 63, fn. 4, 571 N.E.2d 442 (1st Dist.1988); and *Pacher v. Invisible Fence of Dayton*, 154 Ohio App.3d 744, 2003-Ohio-5333, 798 N.E.2d 1121 ¶ 29 (2d Dist.), quoting *L.W. Shoemaker, M.D., Inc. v. Connor*, 81 Ohio App.3d 748, 752, 612 N.E.2d 369 (10th Dist.1992).

{¶ 40} The *Holliday* Court further held that a "reviewing court may set aside a trial court's decision under Civ.R. 41(B)(2) 'only if it is erroneous as a matter of law or against the manifest weight of the evidence.'" *Id.* at ¶ 19, quoting *Osborne, Inc. v. H&R Purchasing, Inc.*, 11th Dist. Lake No. 2003-L-051, 2004-Ohio-3503, ¶ 9.

## D. Analysis

### 1. Presumption Against Suicide

{¶ 41} In Janice's first assignment of error, she argues that the trial court "erred by finding that the presumption against suicide is inapplicable."

{¶ 42} "Ohio has recognized the legal presumption that in the absence of sufficient evidence to the contrary, a person is presumed not to have taken his own life." *Evans v. Natl. Life & Accident Ins. Co.*, 22 Ohio St.3d 87, 488 N.E.3d 1247, 1249 (1986). *See also Shepherd v. Midland Mut. Life Ins. Co.*, 152 Ohio St. 6, 15, 87 N.E.2d 156 (1949) ("[W]here it is shown that death resulted from bodily injury caused by violent and external means without a showing as to how the injury was in fact sustained, there is a presumption that death did not result from suicide, self-infliction of injury, criminal assault of another * * *.").

{¶ 43} Ohio courts have held that this presumption is rebuttable and "disappears or is extinguished upon the production of substantial evidence to the contrary to counterbalance it." *Mohn v. Ashland Cty. Chief Med. Examiner*, 5th Dist. Ashland No. 14-COA-031, 2015-Ohio-1985, ¶ 31.

{¶ 44} Upon review, we find no error in the court's handling of the presumption against suicide. Here, the Medical Examiner found, after its investigation, that the manner of death was suicide. Under R.C. 313.19, the coroner's finding "shall be the legally accepted manner and mode in which such death occurred * * *." As discussed in our analysis of Janice's fourth assignment of error, Janice did not present competent and credible evidence to rebut the presumption that the Medical Examiner's verdict is the legally accepted cause of death. All evidence pointed toward the conclusion that Dr. Costaras jumped from the bridge. His car was parked on the bridge, there was no evidence of foul play, and he was found on the ground below the bridge.

{¶ 45} There is an absence of "competent, credible evidence" to contradict the Medical Examiner's findings. Accordingly, we overrule Janice's first assignment of error.

### 2. Medical Expert

{¶ 46} In Janice's third assignment of error, she argues that the trial court erred "by finding that [she] needed a medical expert to present competent, credible evidence to rebut the coroner's report."

{¶ 47} Our review of the trial court's findings of facts and conclusions of law shows that it did not make a finding that Janice "needed a medical expert" to rebut the Medical Examiner's report. Rather, the trial court stated the following:

> Plaintiff cannot meet her burden of proof by simply arguing that Defendants should have pursued additional avenues of investigation regarding the manner of death. Plaintiff failed to provide any credible evidence at Trial that would support any other manner of death ruling. Plaintiff did not present a medical expert to rebut the Medical Examiner's verdict, thus failing to present competent, credible evidence to the contrary, that the coroner's opinion was inaccurate.

{¶ 48} The Ohio Supreme Court has held that a "coroner's verdict as to the cause of death and the manner and mode in which the death occurred is entitled to much weight." *State v. Manago*, 38 Ohio St.2d 223, 227, 313 N.E.2d 10 (1974), citing R.C. 313.19. Ohio's highest court has further held that the "coroner is a medical expert rendering an expert opinion on a medical question. Therefore, to rebut the coroner's determination, as expressed in the coroner's report and the death certificate, competent, credible evidence must be presented." *Vargo*, 34 Ohio St.3d at 30, 516 N.E.2d 226.

{¶ 49} Accordingly, Janice's third assignment of error is overruled.

### 3. Sufficiency and Manifest Weight of the Evidence

{¶ 50} Janice's second and fourth assignments of error will be discussed together. In Janice's second assignment of error, she argues that the trial court "erred in sustaining [the Medical Examiner's] motion for a directed verdict[1] at the close of [her] case because there was sufficient evidence offered by [her] to allow that reasonable minds could come to more than one conclusion on the determinative issue."

{¶ 51} In Janice's fourth and final assignment of error, she argues that the trial court's "refusal to direct the coroner to change his decision as to the mode of death from suicide to undetermined [is] against the manifest weight of the evidence."

{¶ 52} A manifest weight of the evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court * * * disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 54

---

[1] We note that there was no directed verdict in the case at hand, as suggested in Janice's second assignment of error. Here, the court granted the Medical Examiner's Civ.R. 41(B)(2) motion for dismissal, which concerns the trial court's weighing the evidence.

(1997). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 53} The Ohio Supreme Court has held that the manifest weight of the evidence standard of review "set forth in *Thompkins* also applies in civil cases." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17 ("neither the constitution nor statutes nor rules of procedure treat civil cases differently from criminal cases with regard to appellate review on the issues of sufficiency and manifest weight").

{¶ 54} Upon review, we find that Janice has not rebutted the presumption that the Medical Examiner's determinations are correct with competent, credible evidence to the contrary. We agree with the trial court that Janice did not "meet her burden of proof by simply arguing that [the Medical Examiner] should have pursued additional avenues of investigation regarding the manner of death."

{¶ 55} "Circumstantial evidence and direct evidence inherently possess the same probative value." *Brook Park v. Gannon*, 2019-Ohio-2224, 137 N.E.3d 701, ¶ 25 (8th Dist.). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 56} Janice's evidence is consistent with the determination that the manner of Dr. Costaras's death was suicide. Although there is no direct evidence of

suicide, such as a note or a witness, circumstantial evidence of suicide was presented at trial. For example, evidence of Dr. Costaras's mental health, recent weight loss and disinterest in exercise, and trouble sleeping are indicative of depression. Furthermore, his car was found at the top of the bridge, and he was found on the ground below the bridge. There was no evidence of foul play. As such, this is not the exceptional case in which the evidence weighs heavily against the trial court's judgment.

{¶ 57} Accordingly, Janice's second and fourth assignments of error are overruled.

{¶ 58} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

ANITA LASTER MAYS, P.J., and
EMANUELLA D. GROVES, J., CONCUR